Case No. 15-5190 Association of Private Sector Colleges and Universities Appellant v. Arne Duncan and his official capacity as Secretary of the Department of Education, Office of the Secretary et al. Mr. Cox for the Appellants, Mr. Waldman for the Appellees. We appreciate everybody's willingness to make their schedules a little earlier in hopes that we can all avoid the blizzard of the century or at least blizzard of the year or something. So, without further ado. Good morning, Your Honor. May it please the Court, my name is Douglas Cox. I represent APSCU and I have reserved five minutes for rebuttal. Under the Department's regulation, two schools may offer identical programs that provide identical training at identical costs, yet one may fail while the other passes. These different regulatory outcomes may be the product of graduates' personal job search and family decisions, personal financial circumstances, or even local economic conditions, all unrelated to the quality of training schools provide. A program that provides excellent education at low cost with a 100 percent graduation rate and a 100 percent placement rate can still fail. Congress never gave the Department authority to curtail Title IV eligibility through debt and earnings metrics that turn on factors outside the school's control, and for decades the Department never claimed otherwise. But even if Congress had authorized the Department to condition programs' eligibility on whether programs enable students to repay their debts, this regulation does not do that in a rational way. Key elements of the debt metrics, such as the 8 percent threshold, repayment timelines, are arbitrary and unsupported by the record. This is not, as the Department asserts and the District Court evidently believed, a case about defaulted student loans. This rule does not address defaults. Let me begin with the statute. The plain meaning of prepare students for gainful employment is prepare students for a job that pays. That is supported by the words that Congress chose. It's also supported by the way the Department historically has interpreted the phrase. In a number of cases, administrative law cases back in the 1990s, for example, the Seminor L. Morales case, they said what gainful employment is about is whether or not a program has, quote, an occupational objective. Well, you're not arguing, are you, that if circumstances changed and the Department had new information or additional information, that it couldn't change its position or elaborate further, are you? No, Your Honor, I'm not. But two things. First, as a matter of statutory construction, the fact that they historically have interpreted it that way shows that it's an unreasonable interpretation now. If you accept your plain meaning argument, if you think there's some ambiguity or a gap, then we're in a different analytical. No, Your Honor, I think, again, as a matter of statutory construction, as the Court knows, you look at the text, you use all of the interpreted materials. One of the things the Court will look to is how big is the ambiguity. It doesn't swallow the entire statute. You have to go no further than the ambiguity permits. You look at the words Congress used. You also look at the way they've historically interpreted it. And under Bunty Brothers, the fact that they interpreted it that way illuminates the reasonableness. Then, Your Honor, if I may just jump ahead for a moment so that we don't lose the point in response to your question. Under the APA, of course they can change their mind. Of course they can. But they have to know that they're changing their mind. They have to say they are. That's the teaching of FCC versus Fox. And here, they don't even admit that they did change their mind. So, Your Honor, I think, as a matter of statutory construction, we're clearly right. And as a matter of the APA on this issue, we're also clearly right. Well, of course, in the rulemaking itself, the Department talks about growing concerns that it's seeking to address in this rulemaking. That's right, Your Honor. But they never address their prior position that they had interpreted the gainful employment standard to mean, as the words suggest, a job that pays. So, I just want to be clear about this in my own mind. If they interpreted it to mean, so long as the schools are providing quality education that enables its graduates to obtain gainful employment, is there no implication that gainful employment is tied to the notion that this is not a grant program, but a loan program? No, Your Honor. I don't think that's what the words Congress chose say. I don't think that's, as I say, the way they interpreted it historically. And it is the case, Your Honor, that if you take their reading that gainful must mean profitable, that still doesn't get you to where they want to end up. It's too many jumps in the statutory interpretation. Where would you point to what their previous interpretation of gainful employment was? Your Honor, we cite a number of those cases. One of them is the one I mentioned, the Seminor El Moro's case. Which one is that? It is a case involving a program of education primarily directed at Jewish students. Yes, so I read that case, and that just seems like an easy case. That is one where they were not preparing them for any kind of job at all. That doesn't mean, and the government's position is, that's the threshold level at least you must prepare for an occupation. And if you don't, then we don't need to go to the next question in that case. So that doesn't necessarily resolve this. No, Your Honor, with respect, the Seminor El Moro's case is a case where they uphold the program. It's saying it does train for gainful employment, and the test they apply is we look at it in a very common sense way. Is the course of study serving an occupational objective? There's no suggestion that they're going to look at deaths. So those were the other Jewish theological... There are a number of cases that center on the same set of concerns, Your Honor. Okay. Let me, if I may, turn to the APA. I think it is conceded by the Department that the tests turn on factors the schools cannot control. The death threshold here, this 8% threshold that they bring up, it's from a different context. It's from the mortgage context. It's also the case that it is they've set the ratio of 8% at a level that their own statistics show is too low. So, for example, there's a Education Department study in the appendix at 548 that says that the Department knows that 13% of the graduates for for-profit schools and 16% of graduates of private nonprofit schools who are employed, who are paying back their loans, still have average debt-to-earnings ratios that would fail the test. So I think that that's another thing the court needs to look at under the APA. They're irrationally short timelines. We already talked about the FCC versus Fox issue. Let me also, keeping an eye on the clock here, turn to the third issue we have raised, which has to do with the reporting requirement. The Department does not deny that the requirement that schools report student-specific, personally-identified information, private loan data, violates 1015C's prohibition on maintaining a database of such information. Indeed, it's significant. Congress, in 1015C, made a choice to protect student privacy, and they did it in response to an earlier effort by the Department of Education to create such a database. So what the Department says is, OK, 1015C is against this, but there is a grandfathering exception. They're going to try and put themselves within the exception. But we litigated the exception in what the parties have come to call AFSCU 2, in which the Department basically said, OK, we agree. There has to be an interpretation of that grandfathering exception such that the exception doesn't swallow the rule, as the court said in AFSCU 2. So the limitation that they themselves adopted says that the new information has to fit within the purpose of the existing database. And the Department simply hasn't demonstrated here that the private loan data fits within the overall purpose of the data system. It has never included private loan data in the system before. They make an argument based on 1092BB3, but the language of that regulation shows that it's limited to research, and this is obviously not research. This is a punitive rule. And so the Department is seeking to do here what Congress forbade. They're going to collect individual data that the existing database collected only at the institutional level. So they're shifting the focus from the institution to the individual. Congress has said, no, we want to protect privacy. I'll reserve the remainder of my time. I'm right, though, that there are no individuals who are being added to the database in this program, right? It's individuals who are already in the database. Well, no, Your Honor. As time goes forward, individuals who participate in the program in the future will be added. But they would be added anyway if they got federal loans. But additional information will be included about them. Right. So it's additional information about them, namely their private loans, but it's not additional people, which is the difference between this one and the other district. But it's also the case that the database focuses right now on institutional-level statistics, not individuals. Thank you, Your Honor. Excuse me. May it please the Court, my name is Joshua Waldman. I'm here from the Department of Justice representing the appellee, the United States Department of Education. The department has reasonably construed the gainful employment statute to require programs to provide quality education and training to their students that lead to earnings that allow them to pay back their student loans. That understanding is consistent with the ordinary meaning of the terms, with the purpose and the context of the statute, its legislative history, this Court's prior statement in the last case involving these parties, and the conclusions of three different district courts, including the one that addressed the issue below. The department's debt-to-earnings and debt-to-discretionary income ratios are also rational ways of determining whether students are earning sufficient money to pay back their student loans. They come from numerous studies, experts, and commonly adopted industry standards. The department examined the very same claims made in this case, that the ratios inadvertently measure things like demographics or economic trends or student choices, and found that the evidence just did not support those claims that they would unduly or irrationally skew the outcomes. Instead, the regulation has numerous features that are designed to counter and mitigate precisely those issues by using mean and median figures, by using numerous graduation years, by having a flexible transition period, a limited definition of debt, failing rates with built-in tolerance levels, and numerous years before a program would ever be ineligible. The department reasonably ensured that its ratios would, in fact, measure whether students are prepared for gainful employment rather than factors beyond its control. So is the response to the two schools' argument that if you apply the rule, you'd have to have an extreme case? In other words, as counsel began talking about you could have two schools doing exactly the same thing and one would qualify and one wouldn't, and as I understand the rule, you'd have to have an extreme situation where school A is providing a curriculum and a high percentage of students are paying back the loans, and school B, which is doing something where the students are not, after all of these, what did you call them, measures to counter the concern about two schools doing the same thing and one qualifies and one doesn't. I think that's right, and it's important to remember in that respect that this is a facial challenge to the regulation. I understand, but there's so many schools, et cetera, that the one that they mention, that's your response. It's a facial challenge, so their burden is much higher. Just to try to understand how the rule would work in practice, it seemed to me that was a helpful example. Well, it's an example that I think posits the answer to its own problem, which is it posits and assumes that they're all training in exactly the same way, and therefore the reason for the different result must be something else. So they're already assuming the answer to the question. The fact is that the department examined precisely these things. For example, they say if two schools are coming to different results, it's because, for example, that one of them has a disproportionately high number of low-income students, and so it's really demographics. Now, the department looked at exactly this question, and it did a regression analysis in its rulemaking controlling for low-income students, and it found no evidence to support the fact that having a higher number of low-income students disproportionately affects the result. In fact, low-income students are distributed in roughly equal proportion in programs that were expected to fail, pass, and be in the zone. So they looked at this question, and what the APA requires is a cogent explanation of why the agency exercised its discretion in that way that's based on a rational examination of the fact. That's exactly what they did with respect to student demographics, and they did the same thing with respect to whether people are going into fields that are traditionally lower-paying jobs and all these other factors that they point to. And just to take a few other examples of what can happen, one of the complaints was, well, some students are going into the military, and they get paid less, so they can't afford to pay back their loans. And as we pointed out in our response brief, well, if you get a military deferment, the rule excludes you. And the response was, well, students may forget or just decide not to apply for a military deferment, to which I would say, if we had a certify brief, I would say, well, maybe you want to be counseling these students and helping them fill out their military deferments. Or if they say, well, students are borrowing more because they're spending all their money on fancy cars and clothes and not wisely managing their money, then you should provide some financial counseling to your students. If you're training them in excellent ways and they still don't find jobs that can pay their loans back, maybe you ought to be doing better job placement or career counseling, which is part of what these programs, I think, ought to be doing to prepare their students. So this is not a question of these are things beyond the school's control. And, of course, remember, the largest factor here, which is student debt, is very much within the school's control because debt is defined only by things schools control. Their tuition and expenses and books and supplies and things like that doesn't include housing costs or meal costs. Even though those are part of what students often borrow, they're not counted in the loan debt. And so what the APA requires is a rational explanation of these types of issues, and that's exactly what the department did at each and every turn in its rulemaking, which is why it's not arbitrary either facially and, frankly, I would find it hard to imagine a case where that would be so as applied. As for the statutory interpretation, I think you have to look, as this court frequently does, at the purpose and context and not simply at the words in isolation, although I think the words in isolation still support the department's position. But the purpose here is Congress is lending billions of dollars a year, and it expects these loans to be paid back because otherwise the cost is borne by the federal taxpayers. So the concern here is not just the students get trained and prepared to have any job paying any amount, which would hardly require post-secondary education in the first place, but enough to pay back their loans, which is exactly what this court said in the last opinion it issued involving exactly the same parties. It said that these, this is the direct quote, these requirements, speaking of the ones in Title IV eligibility, are intended to ensure that participating schools actually prepare their students for employees such that those students can repay their loans. That's what this court said, that's what three district courts concluded, and that's what the statutory purpose and context, including the explicit one addressed in the legislative history, when this provision was originally enacted the year before it was merged into the Higher Education Act. The other statutory purpose is, of course, not just that Congress is loaning out its money with the expectation that it would be paid back, but that these students are making an investment in their future, and they're not doing it so they can get any paying job at any amount. Everyone knows why students are going to school, to improve their job prospects, and they need to be able to pay back their loans and then live afterwards. So it's important that they improve and make enough money to pay those loans back and have a living, and not just get any minimum wage job, which is not the purpose. The hypothetical of a school where just in a period of time 90 percent of the students, the graduates, decide to go into the Peace Corps or something comparable, that's simply going to be a school that is not going to qualify for Title IV grants? No, I don't think that you can assume that, because remember, this is all about the ratio between earnings and debt. So what you would hope that would happen in a school like that is that they would make reasonable efforts to keep the expenses of attending a school where you were being, I suppose, trained to go into very low-paying jobs, keep them to a minimum so that the ratio would be appropriate. And they didn't look at the Peace Corps example, but one of the examples that the department did explicitly look at were teachers and nurses and other jobs that were traditionally low-paying. And they said many of these programs are over 90 percent, I think was the figure, were expected to pass, because it's not about how much money you make. It's about the ratio between what you make and what you owe. So you can balance these things out in an appropriate way. What do you say about the El Moro's case and a couple of other administrative adjudications which seem to look only at whether there's a job or not? I say a few things, Judge Garland. First is, of course, this rulemaking did not exist at the time, so the agency was not at all looking at this question of could the statute be interpreted in this way. I think what the department, what those cases represent at most is a view of, number one, if you weren't training them for any type of job, then you weren't passing the statute no matter what. But there's nothing reflected in there that said you couldn't and we read training for a job that pays any amount as the maximum of what Congress permitted under the statute. In other words, there was no question of could the agency elaborate further and add this additional requirement. They never took a position that said all that we can ever do is ask whether you get any paying job at any amount. What level sort of in the department were those decisions made at? They were administrative adjudications. And can somebody appeal from that to the Secretary? I don't know the answer to that yet, but they certainly didn't reach judicial review. And I think it's also important to point out that, first, the agency doesn't view itself as changing its position as opposed to adding a new and additional requirement that never existed before. These very same cases were raised in comments to the rulemaking and were discussed in the agency rulemaking. And we said we don't understand these to have taken a position that says we can't add these requirements, so we don't view ourselves as changing our position. But then, as Judge Rogers pointed out, even if you thought it was, the agency had a very good reason for changing its position, which was it was noticing the mounting level of debt-to-income ratio for students under the GE programs. And they said a lot of these students, an alarming number, are not able to earn enough to pay back their debt. This is a new and growing problem, and they had a reason for adopting this rule. Now, the department didn't think that it was a change at all because they had never addressed the question in adjudication, would the statute permit this type of requirement? So rather than being a change, it's just simply a new rule, like any other new rule. It just didn't exist before. And now it does. You say it was a new and growing problem. As of when? I don't recall the exact date, but they were looking at relatively recent data leading up to, first it was to the rule that was set aside a number of years ago, so I think they began examining this problem around about 2008, 2009. It was far after these adjudications. And before the 2011 rule? Oh, yeah, leading up to it. And then they reexamined the problem again in the next round of rulemaking and found similar data supporting the reasons for making this rulemaking. And in the few minutes remaining, I would just address the reporting requirement very briefly. All that the statute actually says, and we're speaking of 1015C, is that there's a prohibition, but then there's an exception for information that's necessary for the operation of a Title IV program, which the collection of this data is, and was in use before 2008, which the system that we're talking about was, and there's no dispute about that. As Judge Garland pointed out before, even if you accepted some sort of statutory interpretation that required a limitation of some kind on what new data you could add, this is solely data for students who are receiving Title IV loans. This is very different from the last rulemaking where it looked for loan data from all students. And we accepted that limitation that the district court imposed. We narrowed our rulemaking in direct response to it and limited only to people who are receiving Title IV loans. And, of course, it's necessary to do that because if you want to figure out whether someone's going to pay back their Title IV loans, it's important to know what other loans they have to pay back as well. So we do think that it's necessary, and we think it's well within the purpose of the system, which when authorized by Congress explicitly said that it can concern information about other student financial assistance received by the borrower, including private loans, and that's in Section 1092B. Is there a continuing obligation for the student to report private loans, or is it only private loans as of the time of the public loan? I think these are reported after the student graduates. So at that point, presumably, they would no longer be getting student loans after they've already graduated. These are only private student loans, not other kinds of loans. Well, they're also the Title IV loans. I understand, but it's only educational loans. That's right, and it's the kind of loan that you would get if you borrowed all your federal money and then you needed more. I mean, if your uncle lends you $10,000, that's not going to be reported. But then the last point I would make, and my final seconds, is the regulation explicitly says that the portions of it are severable from each other. So if for some reason you found this reporting requirement impermissible, you could easily sever it from the regulation, and the reporting and the rulemaking would go on. As usual, it's just that private loans would be reported as zero, which would only redound to the benefit of schools, because the ratios would be more favorable to the school in those instances than it would be otherwise. But it's not limited to education loans. It's limited to loans are defined in the regulation as the tuition and books and supplies and things like that. No, what I mean is I'm a graduate, and I incur various debts. I'm buying a house, I'm buying a car, I'm buying a boat, you know, all those things. That's all recorded. No, those are not part of student debt. If you buy a house, I mean, obviously you have to pay that money back. No, no, no, I'm talking about what's recorded as to my postgraduate debts. I had a student loan when I was in school under Title IV, and now I've graduated and I've incurred, just hypothetically, a lot of personal debts. All that's going to be recorded, isn't it? No, it's not. The only thing that's recorded are your debts taken out either federally or privately that go to the items that are specified in the regulation, tuition. So if I don't understand how that works, just walk me through it, if you will. I graduate with $100,000 in student loan debts. Then the only thing that's to be recorded is if I borrow money to pay back that $100,000? Well, I think the way it works is normally when you're in school and you're receiving, that's just restricted to Title IV loans for the moment, and you're receiving your Title IV loan check, and I think it's made out to you and to the program and you both co-sign it and it gets deposited and some portion of that goes to tuition and all those other expenses. That type of thing is recorded, but if you are a student and you decide you want to buy a car separately or a house and you get a mortgage, that's not part of the system, your debt. Maybe I'm misunderstanding your question. Well, I thought one of the metrics was trying to evaluate whether I was using my education in an appropriate way so I could pay back this loan. And one of the things that was of interest is am I incurring all kinds of other financial obligations that are making it difficult, if not impossible, for me to repay my loan? Right. I think I understand your question now. And this is part of the 8% and the 12% which assume that you're going to have other loans and other debt, like buying a house and buying a car and other things. And the 8% is set where it is precisely because they recognize that at some point in your life you're likely to buy a house and buy a car and you need other money. So, for example, one of the common underwriting standards is that you want no more than 40%, I think, is the number of your income, and around 30% is usually attributed to housing, and so that leaves about 10%, 12% for other debt, and 8% is usually the figure that these underwriters say is what's appropriate when it comes to your student loans, which is where that number comes from. But that number assumes that student debt is not going to be the only debt in your life, but there's room left in these underwriting standards for other debt in your life. Right. But in terms of recording it in this system, the only thing that gets into the system is your federal loans for school and any private loans, like from a bank, for going to school. That's correct. And my understanding is it's slightly even narrower. What the rule actually uses is only that portion of what you borrow that goes to tuition and other things. If you borrow some portion of it for housing or food, that's not counted under the regulation. If there are no further questions, I'd ask the Court to affirm. Thank you. Does Mr. Cox have any more time? Thank you, Your Honor. I'll go very quickly. Let me start with their defense of the rationality. It's an odd defense. They say, yeah, there are all these things in the rule that are irrational, but we've mitigated them. That's a very odd defense. And when you actually look at the way the rule works, they don't work to mitigate. Let's take something that even the Department admits is outside of schools' control, recessions. They say, well, we've mitigated for that because you've got four years, but that isn't so. If the recession means that in a given year your students have bad employment experiences, you then have to give a warning immediately that says they may in future lose Title IV eligibility. The Department itself admits that those types of warnings can be a death sentence. ACICS, not a school, but an accreditor recognized by the Department, says they're a death sentence. The Department says in the rule a program's rates may be atypical in any given year. That means they can be a fluke. And if in a given year they're a fluke, you then have to give the warning it's a death sentence. Even the Department says that slight statistical imprecision can lead to mischaracterizing a program as zoned or failing, which precipitates substantial negative consequences. That's at 64-946. So I don't think it is rational. In terms of the debate we've been having about El Moro's and the statutory test. Let me ask, the additional statutory provisions about defaults, about the institution, not the program level. Yes. Over what period are those run? I don't know what period those are, but you're right. They're run at the institutional level. Right. That's where Congress put it. Right, but that could have the same problem, right? If there's a, particularly if there's a four-year recession, there could be a lot of defaults. The institution would have to give warnings or whatever it is it has to give as a consequence of the defaults. Congress seems to have assumed that there is a problem. Otherwise, you wouldn't be able to control this at all. Well, no, Your Honor, several things. For starters, in that case, Congress has spoken specifically. They're speaking at the institutional level, and the default rate that they're prepared to recognize is 30%. So I do think that that provision is relevant, Your Honor, because what it says is Congress has struck a balance between protecting the public fisc and the purpose of the Higher Education Act and 1070A about giving access to people. We don't need to have Title IV at all, but Congress decided we want to give people a chance. But Congress doesn't provide any, in that provision, Congress didn't provide any escape hatch for what happens if there's a recession or anything like that, right? No, Your Honor, but again, at the programmatic level, and they tolerate a very high rate of default. It's a very different rule than the one you have in front of you. You mean at the institutional level? Yeah, I'm sorry, at the institutional level, yes. Thank you, Your Honor. One of the things we just heard from my colleague was that the school should be giving financial counseling to their students. The Department has spoken authoritatively on that and given schools the instruction. They cannot provide that kind of financial counseling, so I don't think that gets them over the hump. With respect to the debate we had earlier on, the discussion about Bunty Brothers, I think it's significant, Your Honor, that for 50 years the Department never asserted it had this power, and that under Bunty Brothers you should look at that with a bit of skepticism. Their argument about severing, Your Honor, they say, well, we can sever here because it helps the schools, but the significance of the severing here is they would be taking out of the mix a key data element and that it would be randomizing results, it would be changing the rule that they adopted, it would be undercutting the purposes they say they want to serve, so it would be even more irrational. Thank you, Your Honor. Okay, thank you. Other questions? All right, we'll take the matter under advisement, and you guys should try to go home as soon as you can.
judges: Garland, Rogers, Ginsburg